Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7246 | **DATE** | 3/27/2001 |
| **CASE TITLE** | In Re: In Re: Abbott Lab Derivative etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants now move to dismiss the amended complaint for the same reason. Defendants' motion is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAR 2 8 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail A 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| WAH | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES ) | |
| DERIVATIVE SHAREHOLDER ) | |
| LITIGATION ) | |
| _____ ) | Master File No. 99 C 7246 |
| ) | |
| THIS DOCUMENT RELATES TO ) | |
| ALL ACTIONS ) | |

## MEMORANDUM OPINION AND ORDER

This is one of several lawsuits stemming from a November 2, 1999, consent decree between Abbott Laboratories (Abbott) and the Food and Drug Administration (FDA). Plaintiffs are Abbott shareholders and they have filed this derivative suit against its directors, asserting that the defendant directors are liable under Illinois law for the harms resulting from the consent decree. We dismissed plaintiffs' previous complaint without prejudice for failure to plead demand futility with particularity. *See* In re: Abbott Lab. Derivative Shareholder Litig., 126 F.Supp.2d 535 (N.D. Ill. 2001). Defendants now move to dismiss the amended complaint for the same reason. Defendants' motion is granted.

## BACKGROUND

We will only summarize the underlying facts briefly here, as we have discussed them in some detail elsewhere. *See* Anderson v. Abbott Lab., 2001 WL 185489, 2001 U.S. Dist. LEXIS 2063 (N.D. Ill. Jan. 25, 2001). Abbott's Diagnostics Division (ADD) had continuing problems with the FDA regarding its regulatory compliance procedures over several years. Since 1993, the FDA had conducted numerous inspections. Each time the agency reported violations. On four occasions (Oct. 20, 1993, Mar. 28, 1994, Nov. 5, 1998 and Mar. 17, 1999)

the FDA sent Abbott warning letters, identifying violations and outlining the potential consequences if the company failed to remedy them. The chairman of Abbott's board of directors received copies of these letters.[1] These problems culminated in the November 2, 1999, consent decree, which required Abbott to pay a $100 million fine, withdraw 125 types of medical diagnostic test kits from the United States market, destroy certain inventory, and make various corrective changes in its manufacturing procedures.

Abbott's board is comprised of thirteen members. Two, including the chairman, are "inside directors." They are corporate officers and full-time Abbott employees. The remaining eleven are "outside" or "independent" directors. They receive a monthly stipend for their service on the board, but are not Abbott employees.

## DISCUSSION

Plaintiffs assert that any demand on the directors to act on their behalf would be futile. Fed. R. Civ. P. 23.1 requires a derivative complaint to state futility with particularity. Our prior opinion dismissed the complaint (without prejudice) because plaintiffs failed to do so. The amended complaint does not cure this flaw. As before, we look primarily to Delaware cases for guidance in interpreting the federal pleading requirements and Illinois substantive law.

We will only excuse demand where plaintiffs can raise a "reasonable doubt as to director disinterest or independence." Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984). When plaintiffs allege an omission, rather than a conscious board decision, the Delaware courts have applied the Aronson test in slightly modified form. We must determine "whether or not the

---

[1] Two different people, Duane Burnham and Miles White, held this position during the period in question. Each received the letters sent during his respective tenure.

particularized factual allegations ... create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board could have properly exercised its independent and disinterested business judgement in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). Further, potential liability is not necessarily enough to raise doubt as to independence. "Directors who are sued for failure to oversee subordinates have a disabling interest when 'the potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'" In re: Baxter Int'l, Inc. Shareholder Litig., 654 A.2d 1268, 1269 (Del. Ch. 1995), *quoting* Rales, 634 A.2d at 936.

Here, plaintiffs contend that a demand would have been futile because the directors could themselves be liable for failing to remedy the FDA violations. To prevail on this theory "only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 971 (Del. Ch. 1996).[2] We must also consider Abbott's certificate of incorporation, which exempts directors from liability other than "for acts not in good faith or that involve intentional misconduct or a knowing violation of law." *See* Def. Exh. A. This clause tracks language in the Illinois and Delaware statutes. *See* 805 ILCS 5/2.10(b)(3); 8 Del. Code Ann. § 102(b)(7). Absent non-exempt behavior that could give rise to liability, there would be no reason the directors could not impartially evaluate plaintiffs' demand. Consequently, plaintiffs must plead facts showing a substantial likelihood that

---

[2] Plaintiffs do not allege that Abbott's reporting system was inadequate. To the contrary, they rely on its effectiveness in trying to establish that directors had knowledge of the FDA violations. Consequently, they must show some other systematic oversight failure.

directors engaged in non-exempt behavior.

The parties dispute how we should interpret this liability limitation. The normal standard for director liability is gross negligence. *See* Aronson, 473 A.2d at 812. Clearly, for the clause (and the statute authorizing it) to have meaning, it must at least exempt grossly negligent omissions. Plaintiffs argue that directors may still be liable for recklessness. Defendants maintain that only intentional acts or omissions are non-exempt. Confronted with a similar clause, the Sixth Circuit rejected both extremes, and quoted favorably from a corporate law treatise.

> To the extent that recklessness involves a conscious disregard of a known risk, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under the new statute. On the other hand, to the extent that the conduct alleged to be reckless is predicated solely on allegations of sustained inattention to the duty it is arguable whether such conduct is "grossly negligent," but not conduct amounting to bad faith.

Balloti & Finkelstein, Delaware Law of Corporations and Business Organizations § 4.29 at 4-116 to 4-116.1 (3d ed Supp. 2000), *quoted in* McCall v. Scott, 239 F.3d 808, 818 (6th Cir. 2001). The court appears to have distinguished between two types of recklessness: one akin to gross negligence, which is exempt, and one that demonstrates bad faith, which is not. Although we agree that reckless behavior *can* be, but is not *necessarily*, evidence of bad faith, we do not believe labeling defendants' behavior reckless brings us any closer to determining whether they acted in bad faith. Therefore, it is not a useful standard here. The operative language is not in good faith, and that is the burden plaintiffs must meet.[3]

---

[3] Plaintiffs may also, of course, utilize other listed exceptions, such as intentional misconduct or knowing violations of law. We also note that because the charter clause is an affirmative defense, defendants would bear the burden to show good faith at trial. *See* Emerald Partners v. Berlin, 726 A.2d 1215, 1223-24 (Del. 1999). Plaintiffs, however, must still plead facts raising a reasonable doubt as to the directors' good faith. *See* McCall, 239 F.3d at 818 n.10.

The complaint describes the history of ADD's problems with the FDA. It cites various inspections, violation notices and warning letters. First, it is far from clear that a majority of the board had knowledge of these facts. Plaintiffs seem to ascribe much greater importance to the warning letters than they probably deserve. These letters contain boilerplate language and do not necessarily mean any regulatory action is imminent. *See* In re: Herbalife Sec. Litig., 1996 U.S. Dist. LEXIS 11484 at *11 n.3 (C.D. Cal. Jan. 26, 1986). Throughout this period Abbott's pubic disclosures continued to portray a favorable outlook for company performance. If management believed the FDA's concerns were not a material threat to those projections, and in dismissing the stock fraud claims against Abbott arising from these same facts we held they could reasonably have believed so, there would have been no reason to involve the whole board. *See* Anderson, 2001 WL 185489 at *7, 2001 U.S. Dist. LEXIS 2063 at *23. Based on these facts, we cannot just presume that the chairman shared the letters with the outside directors.

McCall, because it applies an almost identical exemption clause, offers an instructive factual contrast. *See* 239 F.3d at 819-22. There, plaintiffs alleged specific facts suggesting that the directors knew about widespread fraudulent billing practices throughout the company. The complaint makes distinct allegations about each individual director's knowledge. It alleged that the audit committee's report included specific evidence of fraud, and that the board members, based on their individual credentials, would have understood the data's significance. The company's 10K described in detail multiple pending (before the demand date) lawsuits alleging these same fraudulent practices – and we can presume the directors had knowledge of the details listed in the public filings. The complaint also detailed federal

criminal investigations by multiple agencies, search warrants, raids on corporate offices and affidavits from law enforcement officials about facts they discovered. In short, the McCall complaint detailed many facts about the directors, their backgrounds, their roles within the company and extraordinary events of which they were undoubtedly aware. The court found the board's failure to even investigate in the face of such overwhelming evidence of widespread wrongdoing raised doubts that they were acting in good faith. *Id.* at 824.

Here, the only directors whose activities are detailed are the two successive chairmen. All we know from the complaint about the other twelve directors are their names and terms of service. Plaintiffs say nothing else about them individually. The complaint alleges that the audit committee should have uncovered certain problems, without specifying what was reported to them or how they would have discovered those problems. And plaintiffs concede that Abbott's 10K says little, if anything, about its regulatory problems. Further, the public filings' only reference to litigation is that management did not expect it to materially affect performance.[4] Although this does not prove the directors lacked knowledge about FDA compliance issues, it hardly suggests they knew the details of the FDA's actions. And unlike McCall, the problems are not so widespread and egregious that we can presume the directors' knowledge.[5] Further, plaintiffs have still not pled facts suggesting that anyone at Abbott

---

[4] We previously held that management had a reasonable basis for this assessment of Abbott's situation. *See* Anderson, 2001 WL 185489 at *7, 2001 U.S. Dist. LEXIS 2063 at *23. The complaint does not state anything that suggests it reported otherwise to the board.

[5] The Sixth Circuit was willing to make such a presumption in McCall, but explicitly did so because of the magnitude of the allegations there. Four separate federal agencies had launched criminal investigations into systematic fraud throughout that company. And federal agents had already raided one office. 239 F.3d at 822. It is inconceivable that the board would not be aware of such severe and widespread allegations. By comparison, the ongoing pattern of inspections, negotiations and re-inspections between Abbott and the FDA appear routine. And the violations only affected a small percentage of Abbott's products. We further note that the McCall court simultaneously discounted many of the plaintiffs' allegations as speculative. *Id.* at 821, 823 (finding allegations that board knew about illegal acquisition

realized the FDA problems were serious until just before the consent decree.[6] Plaintiffs must plead such facts.

Even assuming defendants had knowledge of these items, their inaction would still not make them liable. Plaintiffs have not alleged facts suggesting Abbott was not making a good faith effort to comply with FDA regulations. As we discussed extensively in the stock fraud case, the correspondence between Abbott and the FDA demonstrates a clear give-and-take. *See* Anderson, 2001 WL 185489 at *3, 2001 U.S. Dist. LEXIS 2063 at *9-10. The FDA continually allowed Abbott to respond to the reported violations and promised re-inspections to confirm they were remedied. Additionally, each successive letter reports predominantly different violations.[7] Plaintiffs have not alleged any facts suggesting a director tracking this correspondence would not have reasonably believed Abbott's management was making a good faith effort to address the violations. The fact that some problems persisted and new ones arose does not by itself indicate bad faith. Even drawing inferences favorable to plaintiffs, we cannot find a substantial likelihood of liability on these facts.

Perhaps the directors could have investigated further and dealt with the FDA violations more aggressively. But their inaction could, at most, be considered negligent. The complaint falls far short of showing bad faith or a knowing violation of law. It does nothing to suggest

---

practices and *New York Times* investigation speculative).

[6] Plaintiffs argue that ADD accounted for 20 per cent of Abbott's revenue, and that the warning letters indicated the FDA could freeze ADD's sales due to continuing violations. As we explained above, however, this is boilerplate language. Plaintiffs have provided no facts suggesting Abbott's management had reason to believe ADD's operations were in any serious jeopardy.

[7] Plaintiffs have attached the warning letters and other correspondence as exhibits to their complaint. We must consider these documents in their entirety, even the portions that may not be favorable to plaintiffs. *See* Matter of Wade, 969 F.2d 241, 249 (7th Cir. 1992) (plaintiffs may plead themselves out of court).

a majority of the directors were complicit in any scheme to stonewall the FDA, or show a substantial likelihood that they engaged in some other non-exempt behavior. Plaintiffs have not raised any reasonable doubts as to the directors' ability to disinterestedly evaluate a demand.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.

_____
JAMES B. MORAN
Senior Judge, U. S. District Court

March 27, 2001.